2012 OK CR 5

**Raymond Eugene JOHNSON, Appellant,**

**v.**

**The STATE of Oklahoma, Appellee.**

**No. D–2009–702.**

Court of Criminal Appeals of Oklahoma.

March 2, 2012.

Doug Drummond, First Asst. District Attorney, Julie Doss, William Musseman, Assistant District Attorneys, Tulsa, OK, attorneys for the State at trial.

Pete Silva, Chief Public Defender, Gregg Graves, Assistant Public Defender, Tulsa, OK, attorneys for the defendant at trial.

Curtis M. Allen, Assistant Public Defender, Tulsa, OK, attorney for appellant on appeal.

E. Scott Pruitt, Attorney General of Oklahoma, Jennifer L. Strickland, Assistant Attorney General, Oklahoma City, OK, attorneys for State on appeal.

## OPINION

C. JOHNSON, Judge.

¶ 1 Appellant, Raymond Eugene Johnson, was tried by a jury and convicted of First Degree Murder (Counts I and II) and First Degree Arson, After Former Conviction of Two or More Felonies (Count III) in the District Court of Tulsa County, Case No. CF 2007-3514. The State filed a Bill of Particulars alleging four aggravating circumstances: (1) the defendant was previously convicted of a felony involving the use or threat of violence; (2) the defendant knowingly created a great risk of death to more than one person; (3) the murder was especially heinous, atrocious, or cruel; and (4) the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.[1] The jury found Appellant guilty on each count charged and found the existence of all alleged aggravating circumstances as to each of Counts I and II. It assessed punishment at death on Counts I and II and at life imprisonment on Count III. The trial court sentenced Appellant accordingly ordering the sentences to be served consecutively. From this Judgment and Sentence Appellant has appealed.[2]

## I. FACTS

¶ 2 Brooke Whitaker lived in a house on East Newton Street in Tulsa with her four children, the youngest of which, Kya, was fathered by Appellant. Around February of 2007, Appellant moved in with Brooke and her children. By April of that year, Brooke and Appellant were having problems. Brooke told her mother that Appellant had threatened to kill her. Because she was frightened, Brooke and her children moved in with her mother for two weeks. During this two week period, Appellant called Brooke's mother and told her that he was going to kill Brooke. Around the first of May, Brooke and Appellant got back together and Appellant moved back in with Brooke.

¶ 3 While Appellant was living with Brooke he was also involved in a relationship with Jennifer Walton who became pregnant by him. Around the first or second week of June 2007, Appellant wanted to move out of Brooke's house and Jennifer arranged for him to stay with a friend of hers, Laura Hendrix. On June 22, 2007, Appellant called Jennifer and asked her to give him a ride. She picked him up from Laura's house at around 10:30 that evening. They drove past the place where Brooke worked to make sure she was at work and they drove past her house to make sure that nobody was there. Jennifer dropped Appellant off on a side street near Brooke's house so that Appellant could walk to the house and retrieve some of his clothes. She left him and drove back to her mother's house. Appellant was going to call another friend to give him a ride to Jennifer's mother's house when he was finished getting his clothes.

¶ 4 At about 1:00 a.m. on June 23, 2007, Appellant called Jennifer and told her that he was at Denny's eating while waiting for Brooke to get home. He called again around 5:00 a.m. to let her know that a friend would bring him home shortly. Appellant called Jennifer two more times around 10:00 a.m. that morning. During these calls he told her that Brooke was dead and that a friend had shot her. Appellant wanted Jennifer to pick him up at a school near Brooke's house. The next time he called he told her that the friend who had killed Brooke was thinking about burning down the house. While Jennifer was waiting for Appellant at the school, Appellant called her again and asked her to pick him up on the street behind the street where Brooke lived. When she arrived at this location, Appellant walked to her car from the driveway of a vacant house. He was carrying two garbage bags which he put in the trunk. When Appellant got into the front passenger seat of Jennifer's car, she noticed that he smelled like gasoline and had blood on his clothes. As she drove away, Jennifer saw flames pouring out of the front window of Brooke's house.

1. 21 O.S.2001, § 701.12(1)(2)(4)(7).

2. Appellant's Petition in Error was filed December 18, 2009. Appellant's Brief in Chief was filed October 18, 2010. Appellee's Brief was filed February 15, 2011. This matter was submitted to this Court on February 23, 2011. Oral Argument was held on October 25, 2011.

¶ 5 Appellant instructed Jennifer to drive to Laura's house where he retrieved the garbage bags from the trunk of the car before they went inside. Appellant placed the bags on the living room floor and started taking things out of them, including money that had blood on it. He washed the blood off of the money and took a shower. When Jennifer asked more questions about what had happened, Appellant told her that his friend had hit Brooke with a hammer. After Appellant got out of the shower he said that he needed to go back to Brooke's house to look for her cell phone because he had used the phone to call Jennifer and he was concerned that his fingerprints would be on it. When they arrived, the street where Brooke's house was located was blocked off and ambulance, fire trucks and police cars were present. Appellant drove to the street behind Brooke's house and looked to see if he had dropped the phone on the driveway of the vacant house he had walked by earlier. He did not find the phone. Appellant next drove to Warehouse Market so that he could put some money on a prepaid credit card. Then they went to the parking lot across the street where Appellant threw his clothes in the dumpster. After stopping at McDonalds and Quiktrip, they went back to Laura's house where Jennifer stayed with Appellant a while before she left him there and went to her mother's house.

¶ 6 Firefighters were called to Brooke's house on east Newton Street at 11:11 a.m. on June 23, 2007. When they arrived and made entry into the house, the inside was pitch black with smoke. After they ventilated the house and cleared some of the smoke they found Kya's burned body inside the front door on the living room floor behind the couch. The infant was dead. In a room off the living room, firefighters found Brooke Whitaker on the floor partially underneath a bunk bed. She had extensive burns on her body, was unconscious without a pulse and was not breathing. Paramedics initiated resuscitation efforts and a pulse was reestablished. On the way to the hospital paramedics noticed a lot of blood pooling around her head. When they looked closer, they observed large depressions, indentations and fractures on her head. Brooke was pro-

nounced dead shortly after she arrived at the hospital and was later determined to have died from blunt trauma to the head and smoke inhalation. Seven month old Kya was determined to have died from thermal injury, the effect of heat and flames.

¶ 7 Investigation of the crime scene revealed numerous items of evidence. A burned gasoline can was recovered from the front yard of the residence and samples of charred debris were collected from the house. The debris was tested and some of it was confirmed to contain gasoline. Additionally, investigators noted blood smears and blood soaked items in numerous places throughout the house. Brooke's cell phone was found on the living room floor and investigators discovered that two calls had been made from this phone to Jennifer Walton shortly before the fire was reported.

¶ 8 Walton was located and interviewed by the police later that same day. She told police about Appellant's involvement in the homicide and she told them that she had taken Appellant to a trash dumpster when he returned from Brooke's house after the fire. When the police went to the dumpster they recovered a white trash bag that contained boots, bloody clothing, Brooke Whitaker's wallet with her driver's license inside and a claw hammer. They also found blood on the passenger side door handle inside Walton's car.

¶ 9 Pursuant to information given to them by Walton, the police went to Laura Hendrix's house in Catoosa to look for Appellant. They set up surveillance and observed him exit the house and walk down the street at around 6:00 p.m. on June 23, 2007. He was arrested at that time on outstanding warrants and was taken to the Tulsa Police Station where he waived his Miranda rights and gave a statement to the police.

¶ 10 Appellant told the police that Jennifer Walton had taken him to Brooke's house to get his stuff the evening of June 22, 2007. When Brook came home in the early morning hours of June 23, 2007, they talked and started arguing with each other. During the argument, Brooke pushed him, called him names and got a knife to stab him. He

grabbed a hammer and hit her on the head. Brooke fell to the floor and asked Appellant to call 911. Appellant hit her about five more times on the head with the hammer. Despite her injuries, Brooke was conscious and talking. She said that her head hurt and felt like it was going to fall off. Brooke begged Appellant to get help and told him that she wouldn't tell the police what had happened but he wouldn't do it because he didn't want to go to jail. Instead, Appellant went to the shed and got a gasoline can. He doused Brooke and the house, including the room where the baby was, with gasoline. He set Brooke on fire and went out the back door. Appellant admitted that he was trying to kill Brooke.

## II. ARREST

¶ 11 Appellant complains in his first proposition that the use of traffic warrants to arrest him was pretextual and the officers who arrested him were acting outside of their jurisdiction. Thus, he claims, his arrest was illegal and the statements he made to the police shortly after his arrest should have been suppressed. Prior to trial Appellant filed a motion to suppress the evidence based upon this ground. A hearing was held and Appellant's motion to suppress was subsequently overruled. Appellant argues on appeal that this ruling was in error. When reviewing the denial of a motion to suppress, we review the trial court's ruling for an abuse of discretion. See Nilsen v. State, 2009 OK CR 6, ¶ 5, 203 P.3d 189, 191; Seabolt v. State, 2006 OK CR 50, ¶ 5, 152 P.3d 235, 237. We review de novo the trial court's legal conclusion that the facts fail to establish a constitutional violation. Burton v. State, 2009 OK CR 10, ¶ 9, 204 P.3d 772, 775.

¶ 12 Appellant first asserts that his arrest on outstanding warrants was illegal because it was solely a pretext to hold him for questioning about the homicides. However, if police have a valid right to arrest an individual for one crime, it does not matter if their subjective intent is in reality to collect information concerning another crime. Bland v. State, 2000 OK CR 11, ¶ 48, 4 P.3d 702, 718. "Whether a Fourth Amendment violation has occurred, 'turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time, ... and not on the officer's actual state of mind at the time the challenged action was taken.'" Maryland v. Macon, 472 U.S. 463, 470–71, 105 S.Ct. 2778, 2783, 86 L.Ed.2d 370 (1985) quoting Scott v. United States, 436 U.S. 128, 136–39 n. 13, 98 S.Ct. 1717, 1722, 1724 n. 13, 56 L.Ed.2d 168 (1978). See also Whren v. United States, 517 U.S. 806, 812–13, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89, 98 (1996) (Supreme Court reiterated its position that it was unwilling to entertain Fourth Amendment challenges based upon the actual motivations of individual officers); Phillips v. State, 1999 OK CR 38, ¶ 41, 989 P.2d 1017, 1031. If the police action could have been taken against an individual "even absent the 'underlying intent or motivation,' there is no conduct which ought to have been deterred and thus no reason to bring the Fourth Amendment exclusionary rule into play for purposes of deterrence." See 1 Wayne R. LaFave, Search and Seizure § 1.4(e) (4th ed. 2004). In other words, if the alleged pretextual arrest could have taken place absent police suspicion of Appellant's involvement in another crime, then the arrest is lawful. In the present case, Appellant was arrested on outstanding warrants which were issued before the murders occurred. The officers legally executed the valid arrest warrants and their subjective intent does not make this otherwise lawful conduct illegal or unconstitutional.

¶ 13 Appellant also complains that his arrest was unlawful because the Tulsa police officers who arrested him were acting outside of their jurisdiction when they arrested him in Catoosa. The record reflects that Appellant had four outstanding warrants at the time of his arrest—two were misdemeanor warrants issued by the Tulsa County District Court for failure to appear for state traffic warrants and two were issued by the Tulsa Municipal Court for failure to appear for tickets for violations of municipal ordinances. As the State points out, Tulsa police officers had jurisdiction under 22 O.S.2001, § 175 to arrest Appellant anywhere in the state on the warrants issued by the district court for failure to appear on state traffic warrants.

Section 175 provides, "All warrants, except those issued for violation of city ordinances, may be served by any peace officer to whom they may be directed or delivered." Further, Tulsa police officers had the authority under 11 O.S.2001, § 28–121 to arrest Appellant anywhere in the state on the warrants issued for violation of municipal ordinances by the Tulsa County Municipal Court. Section 28–121 provides that "[a] law enforcement officer of the municipality or a county sheriff may serve an arrest warrant issued by the municipality any place within this state." Thus, it is clear that the Tulsa police officers had jurisdiction to arrest Appellant in Catoosa on any of the four outstanding bench warrants. Accordingly, the trial court did not abuse its discretion in denying Appellant's motion to suppress based upon his argument that his arrest was unlawful.

### III. STATEMENT

¶ 14 In Proposition II, Appellant argues that his statement should have been suppressed because it was not voluntarily made. A statement is voluntary, and thus admissible in evidence, only when it is "the product of an essentially free and unconstrained choice by its maker." *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961). "Whether a suspect's statements to police are voluntary in the legal sense depends on an evaluation of all the surrounding circumstances, including the characteristics of the accused and the details of the interrogation." *Underwood v. State*, 2011 OK CR 12, ¶ 33, 252 P.3d 221, 238, *citing Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). When the admissibility of a confession is challenged at trial, the State must establish voluntariness by a preponderance of the evidence. *Young v. State*, 2008 OK CR 25, ¶ 19, 191 P.3d 601, 607.

¶ 15 In the present case, the district court heard evidence regarding the voluntariness of Appellant's statement at an *in camera* hearing pursuant to *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), and ruled the statement was admissible. On appeal, we consider whether the district court's ruling "is supported by competent evidence of the voluntary nature of the statement." *Davis v. State*, 2004 OK CR 36, ¶ 34, 103 P.3d 70, 80. Again, we review the trial court's ruling on a motion to suppress for an abuse of discretion. *See Nilsen*, 2009 OK CR 6, ¶ 5, 203 P.3d at 191.

¶ 16 Appellant testified at the *Jackson v. Denno* hearing that after his arrest, he was placed in the front passenger seat of a police car. When the officer got into the driver's seat, he said to Appellant, "Well, let me get this out of the way. I don't want the fine citizens of Tulsa to see the police kicking your ass." The officer started to drive and asked Appellant if he knew why he was under arrest. Appellant responded that he did not. The officer who was driving then hit Appellant on the left side of his face. The officer asked if they needed to "refresh" Appellant's memory and he asked the officer in the backseat of the car to pass him a telephone book. The officer in the backseat passed the telephone book to the officer who was driving and then used leg irons to choke Appellant from behind. During the drive, the officer in the front seat hit Appellant in the face a couple of times with the telephone book. The officers showed Appellant a picture of his daughter, Kya, and asked him if it refreshed his memory. Appellant started crying and the officers told him to work with them and tell them what happened. Appellant told the officers that he wanted an attorney and they told him that there would be no lawyers and that he would not waste their time. Appellant said that he made statements to the officers in the car during the transport because he was "kind of scared" and knew that they would continue to harm him. ·

¶ 17 Appellant testified at the *Jackson v. Denno* hearing that at the police station, he was placed in a room where he waited alone for about five minutes before he was joined by Detective Regalado who read him his rights. When Appellant said that he wanted a lawyer, Regalado stopped the tape recorder and left the room. When Regalado returned, he was accompanied by the two officers who had transported Appellant to the police station. They started hitting Appellant and giving him body blows. They beat

him and told him that there would be no lawyers. They coerced him into cooperating with them by threatening to charge Jennifer Walton with accessory to murder. When they were finished, they put him back into his chair and left the room again. A few minutes later Regalado began the interview again and Appellant cooperated and gave his video recorded statement. When the interview was finished, Appellant was escorted by the police to a car in which he was transported to the David L. Moss correctional facility. As he was walking to that car, news reporters took photographs of him. He claimed in the hearing that these photos showed injuries and swelling on his face from the beatings he had endured prior to giving his statement.[3]

¶ 18 Tulsa Police detective Victor Regalado also testified at the *Jackson v. Denno* hearing. He testified that before the interview began, he directed another officer to remove Appellant's handcuffs from behind him and move them to the front. Regalado introduced himself, and asked Appellant preliminary questions about the spelling of his name and his education. Then Regalado read Appellant his rights and asked Appellant if he understood them. Appellant indicated that he understood his rights and he agreed to talk with the officer. Appellant did not request an attorney. Regalado testified that Appellant did not appear to be under the influence of any type of intoxicants. Appellant appeared to understand what Regalado was saying to him and he gave coherent answers, articulating well and appearing to be focused. Regalado denied making any threats or promises to Appellant or seeing others make threats or promises to him. Regalado denied kicking, hitting or punching Appellant and testified that he did not see anyone do these things to Appellant. Regalado testified that Appellant did not appear to have any injuries indicating that he had been assaulted by the victim or anyone else. When asked, Appellant referred only to one

slight injury he had received about two weeks earlier during an argument with Brooke Whitaker. Appellant did not ask to stop questioning or request an attorney during the interview.[4]

¶ 19 Tulsa Police Officer Philip Forbrich testified for the State in rebuttal. He was one of the officers who transported Appellant from Catoosa to the police station in Tulsa. Forbrich testified that Detective Sokoloski drove and Appellant was placed in the front passenger seat of the car while he sat in the back seat. The ride to the police station took about thirty minutes during which there was very little conversation. Forbrich testified Appellant was not hit or threatened during the transport.

¶ 20 Despite Appellant's testimony at the suppression hearing, the record strongly supports the conclusion that his statement and waiver of his rights was the product of a free and deliberate choice rather than intimidation or coercion. We find from the totality of the circumstances, there is competent evidence supporting the trial court's decision denying Appellant's motion to suppress his statements.

## IV. ISSUES RELATING TO JURY INSTRUCTIONS

▉ ¶ 21 In his third proposition Appellant argues that the trial court erred in denying defense counsel's request that the jury be instructed that they had to find that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. The trial court's decision to give or refuse a requested jury instruction is reviewed on appeal for an abuse of discretion. *Soriano v. State*, 2011 OK CR 9, ¶ 10, 248 P.3d 381, 387.

▉ ¶ 22 Appellant acknowledges that this Court has held that the State is not required to prove beyond a reasonable doubt

---

3. Photos taken of Appellant as he left the police station were admitted into evidence. These were not good quality photos and do not clearly depict injuries to Appellant's face.

4. The video tape of Appellant's interview with Detective Regalado was admitted into evidence

during the hearing. This recording corroborated Regalado's testimony about the content of the interview as well as Appellant's demeanor and appearance during the interview. The video recording does not depict the injuries Appellant claims were inflicted prior to the interview.

that the alleged aggravating circumstances outweigh the mitigating factors. *Harris v. State,* 2004 OK CR 1, ¶ 66, 84 P.3d 731, 754–55. However, he urges this Court to reconsider this position in light of the recently decided Supreme Court authority. We have already done so. In *Glossip v. State,* 2007 OK CR 12, ¶ 118, 157 P.3d 143, 161, we rejected the argument that failure to give this instruction resulted in a death sentence that is unconstitutional and unreliable under *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Further, we have consistently rejected this claim in more recent cases. *See Cuesta–Rodriguez v. State,* 2010 OK CR 23, ¶ 103, 241 P.3d 214, 245; *Mitchell v. State,* 2010 OK CR 14, ¶ 127, 235 P.3d 640, 665; *Rojem v. State,* 2009 OK CR 15, ¶ 27, 207 P.3d 385, 396; *Torres v. State,* 2002 OK CR 35, ¶¶ 5-7, 58 P.3d 214, 216. We are not persuaded to revisit the issue here and we continue to hold that no such instruction is necessary, as Oklahoma law requires only that jurors unanimously find any aggravating circumstance beyond a reasonable doubt. *Harris,* 2004 OK CR 1, ¶ 66, 84 P.3d at 754–55. The trial court did not abuse its discretion in declining this requested instruction.

¶ 23 Defense counsel also requested an instruction defining "life without the possibility of parole." The trial court declined to give the requested instruction finding that the meaning of this phrase is self-evident. Appellant argues in his fourth proposition that this ruling was in error. Again, the trial court's decision to give or refuse a requested jury instruction is reviewed on appeal for an abuse of discretion. *Soriano,* 2011 OK CR 9, ¶ 10, 248 P.3d at 387. Appellant notes that this Court has never required a trial court to give this type of instruction but he asks us to reconsider this issue in the case at bar.

¶ 24 This Court has long held that the meaning of life without parole is self-explanatory and an instruction on its meaning is not required. *Warner v. State,* 2006 OK CR 40, ¶ 158, 144 P.3d 838, 885. *See also Murphy v. State,* 2002 OK CR 24, ¶ 52, 47 P.3d 876, 886; *Young v. State,* 2000 OK CR 17, ¶ 102, 12 P.3d 20, 46. However, Appellant argues that this line of cases is outdated. In support of

his argument Appellant cites to several cases where the jury asked questions about the punishment of life without parole although in the present case, the jury asked no questions indicating confusion about the punishment of life without the possibility of parole. Appellant also cites to *Simmons v. South Carolina,* 512 U.S. 154, 156, 114 S.Ct. 2187, 2190, 129 L.Ed.2d 133 (1994), wherein the Supreme Court held that "where the [capital] defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." However, where the jury is instructed on the three punishment options of life, life without the possibility of parole and death, this Court has held that the three-way choice fulfills the *Simmons* requirement that a jury be notified if the defendant is parole ineligible. *Wood v. State,* 2007 OK CR 17, ¶ 18, 158 P.3d 467, 475 ("[I]nstructing a capital sentencing jury on the three statutory punishment options, with their obvious distinctions, is sufficient to satisfy the due process concerns addressed in *Simmons.*").

¶ 25 Appellant's argument regarding the necessity of an instruction defining the punishment option of life without the possibility of parole falls short. If there is a case which calls for the reconsideration of this issue, it is not the case before us. We find Appellant was not denied due process or a fundamentally fair trial when the trial judge declined to provide the jury more information on this issue than is currently required.

## V. ISSUES RELATING TO VOIR DIRE

¶ 26 Appellant argues in his fifth proposition that he was denied his constitutional right to an adequate voir dire by the trial court's denial of his request for sequestered, individualized voir dire. This Court reviews the manner and extent of a trial court's voir dire under an abuse of discretion standard. *Williams v. State,* 2008 OK CR 19, ¶ 27, 188 P.3d 208, 217.

¶ 27 Appellant acknowledges that this Court has never found that individual, sequestered voir dire is required in all capital

cases. Indeed, "[w]e have left the decision for individual voir dire to the discretion of the district court and have rejected requests for a mandatory rule requiring the use of individual sequestered voir dire in capital cases." *Harmon v. State*, 2011 OK CR 6, ¶ 13, 248 P.3d 918, 929, *citing Jones v. State*, 2006 OK CR 17, ¶ 16, 134 P.3d 150, 156.[5] Although a defendant has no automatic right to individual voir dire, he has the right to request such as individual voir dire has been deemed appropriate in certain cases. *See Harmon*, 2011 OK CR 6, ¶ 13, 248 P.3d at 929 (individual voir dire appropriate in cases that have been the subject of extensive pre-trial news coverage); *Cuesta–Rodriguez*, 2010 OK CR 23, ¶ 57, 241 P.3d at 233 ("Individual voir dire is appropriate where the record shows jurors were not candid in their responses about the death penalty, or that responses were tailored to avoid jury service."). Because the purpose of voir dire is to determine whether there are grounds to challenge prospective jurors for either actual or implied bias and to facilitate the intelligent exercise of peremptory challenges, the crux of the issue is whether the defendant can receive a fair trial with fair and impartial jurors. *Harmon*, 2011 OK CR 6, ¶ 13, 248 P.3d at 929; *Mitchell v. State*, 2010 OK CR 14, ¶ 11, 235 P.3d 640, 646.

¶ 28 Appellant does not allege that this case received extensive pre-trial media coverage or that jurors were not candid in their responses about the death penalty or provided responses tailored to avoid jury service. Rather, he argues generally that the denial of individualized, sequestered voir dire adversely affected his right to the effective assistance of counsel and due process. The record does not support his argument. As the State points out, although the trial court did not grant defense counsel's request for individualized voir dire, the court did utilize jury questionnaires. Additionally, the trial court advised the attorneys that the motion for individualized voir dire could be reurged and reconsidered if required and the trial court did, in fact, allow some potential jurors to be questioned individually and outside the

presence of the prospective jury panel when such was deemed necessary. There is no evidence that full sequestered, individualized voir dire was necessary or that Appellant did not receive a fair trial with fair and impartial jurors. The district court did not abuse its discretion in denying defense counsel's request.

¶ 29 Appellant argues in his Sixth Proposition that the jury selection process violated his constitutional rights because the trial court improperly dismissed potential jurors who revealed in voir dire that they would 'automatically' exclude the death penalty as an option due to their personal beliefs, without giving defense counsel the opportunity to further question and rehabilitate them. Appellant complains that the trial court's excusal of these prospective jurors for cause left him with a group of potential jurors composed of death penalty advocates. Again, the manner and extent of a trial court's voir dire is reviewed on appeal under an abuse of discretion standard. *Williams*, 2008 OK CR 19, ¶ 27, 188 P.3d at 217.

¶ 30 "The proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Williams v. State*, 2001 OK CR 9, ¶ 10, 22 P.3d 702, 709, *quoting Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). "Due process of law requires that a prospective juror be willing to consider all the penalties provided by law and not be irrevocably committed to a particular punishment before the trial begins." *Sanchez v. State*, 2009 OK CR 31, ¶ 44, 223 P.3d 980, 997. Deference must be paid to the trial judge who sees and hears the jurors because the trial judge is in a position to personally observe the panelists, and take into account a number of non-verbal factors that cannot be observed from a transcript. *Harmon*, 2011 OK CR 6, ¶ 18, 248 P.3d at

5. This Court in *Jones* declined to adopt a mandatory rule requiring the use of individual sequestered voir dire in capital cases but did urge trial courts to use a juror questionnaire and conduct individual sequestered voir dire in capital cases. *Jones*, 2006 OK CR 17, ¶ 16, 134 P.3d at 156.

929–30; *Grant v. State*, 2009 OK CR 11, ¶ 17, 205 P.3d 1, 11. Further, where, as in the present case, the trial court used the questions set forth in Oklahoma Uniform Jury Instruction (OUJI–CR 2d) 1–5, and the last-recorded answers of these prospective jurors indicated that they were not able to consider the death penalty, this Court held that the trial court did not abuse its discretion in striking the prospective jurors for cause without allowing defense counsel an opportunity to further question them. *Jones v. State*, 2009 OK CR 1, ¶ 17, 201 P.3d 869, 877.

■ ¶ 31 Although Appellant makes a broad claim of error regarding the trial court's excusal of prospective jurors for cause without allowing defense counsel an opportunity to rehabilitate the jurors, he only complains specifically about the dismissal of one prospective juror. The record reflects that Juror R. initially told the trial court that she could consider all three punishment options and that she could impose the death penalty in the "proper case." However, she later expounded upon this clarifying that the only circumstance under which she could consider imposing the death penalty would be if the case involved someone she knew or her children. When the prosecution moved to have Juror R. removed for cause, defense counsel objected arguing that her inability to consider the death penalty as an option was not clear and he requested the opportunity to question her further. The trial court noted that Juror R.'s response was quite unequivocal about her inability to consider the death penalty in cases in which her children had not been murdered. The court denied defense counsel's request and excused Juror R. for cause. We find on this record that the trial court did not abuse its discretion in declining defense counsel's request to further voir dire this prospective juror and in excusing her for cause after she had been asked the appropriate clarifying questions regarding her willingness to consider the death penalty, and her last recorded response indicated that she was not able to follow the law and consider the death penalty.

¶ 32 We also note that the record clearly does not support Appellant's broad assertion that the trial court excused all prospective jurors who were conscientiously opposed to the death penalty leaving him only with a group of potential jurors composed of death penalty advocates. As the State points out, the trial court denied the prosecution's motion to dismiss for cause one prospective juror who initially indicated that she could never return a verdict which assessed the death penalty but later stated that she could consider the death penalty under certain circumstances, but that she did not support it generally as she considered it to be a "violation of our basic human rights." This prospective juror, although personally opposed to the death penalty, stated that she could consider it as an option and was not removed from the panel for cause. The trial court did not improperly dismiss potential jurors leaving Appellant with a group of potential jurors composed of death penalty advocates. The jurors who served on this case indicated they could consider all three penalties provided by law. There was no abuse of discretion in the manner and extent of the trial court's voir dire. This proposition is denied.

## VI. CONSTITUTIONALITY OF THE DEATH PENALTY

¶ 33 Appellant contends in his seventh proposition that his death sentence must be reversed because capital punishment is unconstitutional as applied. Appellant's argument, that capital punishment is unworkable and ultimately unconstitutional, is based largely upon the position of the American Law Institute that the death penalty cannot be adequately administered. This argument is not unlike earlier arguments urging this Court to adopt the resolution of the American Bar Association recommending a moratorium on the imposition of death penalty. We have consistently rejected this position. *See Martinez v. State*, 1999 OK CR 47, ¶ 27, 992 P.2d 426, 432; *Alverson v. State*, 1999 OK CR 21, ¶ 58, 983 P.2d 498, 517; *Patton v. State*, 1998 OK CR 66, ¶ 115, 973 P.2d 270, 300.

■ ¶ 34 In the present case, Appellant notes several obstacles to providing adequate capital justice including the politicization of the capital process, racial discrimination, inadequacy of court regulation, inadequacy of

resources of capital defense services and the lack of meaningful independent federal review of capital conviction. Most of these arguments are policy arguments which are best left to the legislature. *Hogan v. State,* 2006 OK CR 19, ¶ 82, 139 P.3d 907, 934 (policy matters fall within the purview of the legislature and not the courts). Further, although issue of race as a factor in the imposition of the death penalty is not a policy argument, Appellant acknowledges that he cannot prove that his sentence of death was racially motivated. Absent such a showing, relief is not warranted on this claim. *Alverson,* 1999 OK CR 21, ¶ 58 n. 79, 983 P.2d at 517 n. 79, *citing McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987)(relief will not be granted on the basis of discrimination unless the Appellant can show the jurors in his particular case acted with discriminatory purpose).

¶ 35 As in earlier cases, Appellant has failed to offer authority showing that his execution would be violative of the constitution. We decline to consider this issue further.

## VII. EFFECTIVE ASSISTANCE OF COUNSEL

¶ 36 In his eighth proposition, Appellant argues that he was denied his Sixth Amendment right to the effective assistance of counsel because his attorney conceded in his opening statement, without Appellant's consent, that Appellant had set Brooke Whitaker on fire. This Court reviews claims of ineffective assistance of counsel under the two-part *Strickland* test that requires an appellant to show: (1) that counsel's performance was constitutionally deficient; and (2) that counsel's performance prejudiced the defense, depriving the appellant of a fair trial with a reliable result. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Davis v. State,* 2005 OK CR 21, ¶ 7, 123 P.3d 243, 246. It is not enough to show that counsel's failure had some conceivable effect on the outcome of the proceeding. Rather, an appellant must show that there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. *Head v. State,* 2006 OK CR 44, ¶ 23, 146 P.3d 1141, 1148. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

¶ 37 In support of his position, Appellant cites to *Jackson v. State,* 2001 OK CR 37, ¶ 25, 41 P.3d 395, 400, where this Court stated, "a complete concession of guilt is a serious strategic decision that must only be made after consulting with the client and after receiving the client's consent or acquiescence." However, the record before this Court reveals that defense counsel in the present case did not expressly concede guilt. Rather, in opening argument, defense counsel stated that he anticipated the jury would hear evidence from the Fire Marshall indicating that Kya's body was found at the point of ignition. In order to diffuse the impact of this evidence indicating that Appellant intentionally set Kya on fire, defense counsel offered another explanation. He suggested to the jury that this evidence "indicat[ed] that when Brooke was set on fire," she ran to get Kya and when she did this, Brooke transferred gasoline to Kya before dropping the child to the floor in her failed attempt to save them both. While this argument may have suggested that the evidence would show that Appellant set Brooke on fire, this was not an unreasonable trial strategy in light of Appellant's confession to intentionally murdering Brooke and his denial of intentionally harming Kya. The entire argument taken in context supports the conclusion that defense counsel's argument was neither an overt nor a complete concession of guilt and thus, Appellant's consent was not required. *See Lott v. State,* 2004 OK CR 27, ¶ 51, 98 P.3d 318, 337.

¶ 38 Appellant has failed to show his counsel's representation fell below an objective standard of reasonableness or that any errors by counsel were so serious as to deprive him of a fair trial with a reliable result. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. Appellant was not denied his Sixth Amendment right to the effective assistance of counsel.

## VIII. CUMULATIVE ERROR

¶ 39 Finally, Appellant claims that trial errors, when considered cumulatively, deprived him of a fair sentencing determination. This Court has recognized that concession when there are "numerous irregularities during the course of [a] trial that tend to prejudice the rights of the defendant, reversal will be required if the cumulative effect of all the errors was to deny the defendant a fair trial." *DeRosa v. State*, 2004 OK CR 19, ¶ 100, 89 P.3d 1124, 1157, *quoting Lewis v. State*, 1998 OK CR 24, ¶ 63, 970 P.2d 1158, 1176. Upon review of Appellant's claims for relief and the record in this case we conclude that although his trial was not error free, any errors and irregularities, even when considered in the aggregate, do not require relief because they did not render his trial fundamentally unfair, taint the jury's verdict, or render sentencing unreliable. Any errors were harmless beyond a reasonable doubt, individually and cumulatively.

## IX. MANDATORY SENTENCE REVIEW

¶ 40 Title 21 O.S.2001, § 701.13 requires this Court to determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance." After conducting this review, this Court may order any corrective relief that is warranted or affirm the sentence. 21 O.S.2001, § 701.13(E).

¶ 41 We have reviewed the record in this case in conjunction with Appellant's claims for relief and have found that his conviction and death sentence were not the result of the introduction of improper evidence, improper witness testimony, prosecutorial misconduct or trial court error. We therefore find Appellant's death sentence was not imposed because of any arbitrary factor, passion or prejudice.

¶ 42 The jury's finding that Appellant had been previously convicted of a felony involving the use or threat of violence, knowingly created a great risk of death to more than one person, that the murders were especially heinous, atrocious, or cruel and that there existed a probability that he would commit criminal acts of violence that would constitute a continuing threat to society is amply supported by the evidence. Appellant's jury did not consider any improper aggravating evidence in deciding punishment. Weighing the aggravating circumstances and evidence against the mitigating evidence, we find, as did the jury below, that the aggravating circumstances outweigh the mitigating circumstances. The Judgment and Sentence of the district court is **AFFIRMED.**

## DECISION

¶ 43 The Judgment and Sentence of the district court is **AFFIRMED.** Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2012), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

A. JOHNSON, P.J., LEWIS, V.P.J., and SMITH, J.: concur.

LUMPKIN, J.: concur in result.

