**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 1, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

ETHAN JOHNSON SPRUILL,

    Petitioner - Appellant,

v.

JEROLD BRAGGS, JR., Warden,

    Respondent - Appellee.

No. 20-6009
(D.C. No. 5:19-CV-00442-D)
(W.D. Oklahoma)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **PHILLIPS**, **MURPHY**, and **McHUGH**, Circuit Judges.
_____

Petitioner Ethan Johnson Spruill, a prisoner in Oklahoma state custody proceeding

with the assistance of counsel, sought a Certificate of Appealability ("COA") to

challenge the district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas

corpus. On June 17, 2020, we granted a COA as to one of the three claims Mr. Spruill

asserted in the petition—a Fifth Amendment self-incrimination claim[1]—but we denied

_____

[*] This order and judgment is not binding precedent except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] The Fifth Amendment's privilege against self-incrimination is applicable to the
states through the Fourteenth Amendment's Due Process Clause. *See Malloy v. Hogan*,
378 U.S. 1, 6 (1964).

the request as to the remaining two claims. We now affirm the district court's denial of his self-incrimination claim.

## I. BACKGROUND

### A. Factual Background

In January of 2014, Mr. Spruill moved into an apartment building in Norman, Oklahoma, in a unit directly above that of Aaron McCray, Mr. McCray's fiancée, Stephanie Grantham, and their two children. During the next month, Mr. Spruill learned that Ms. Grantham and Mr. McCray had complained of noise emanating from his apartment, leading to a conversation in which Mr. Spruill asked the couple to contact him directly about future noise complaints.

On February 15, 2014, Mr. Spruill returned to his apartment after a day of drinking. After smoking marijuana in his apartment, he joined a group of people socializing outside his apartment. Ms. Grantham approached and complained that Mr. Spruill had awoken her children by stomping on his apartment floor (Ms. Grantham's ceiling). Mr. Spruill angrily denied having stomped on the floor, told Ms. Grantham that he could hear her yelling at her children every night, and accused her of abusing her children.

Later, Mr. Spruill went downstairs to confront the couple, carrying, as he always did, a revolver on his hip pursuant to a concealed carry permit. Mr. Spruill knocked on the door and, when the couple did not immediately admit him, Mr. Spruill again accused them of abusing their children, called them cowards, and remarked, "It's not like I'm going to shoot you, or am I?" App., Vol. I at 52.

2

Mr. McCray ultimately opened the door, but what happened next was the subject of divergent testimony at trial. According to Mr. Spruill, Mr. McCray grabbed him around the neck, pulled him into the apartment, threw him on the floor between two chairs, and Mr. McCray used the weight of his body to restrain Mr. Spruill while simultaneously choking him. According to Ms. Grantham, Mr. Spruill stumbled into the apartment, at which point Mr. McCray asked him to leave and tried to push him out the door. Ms. Grantham further testified that only after Mr. Spruill refused to leave did the two begin fighting on the floor.

At some point during the tussle, Mr. Spruill became convinced that Mr. McCray would kill him from the continued choking. He unholstered his revolver and shot Mr. McCray in the chest several times, killing Mr. McCray. Mr. Spruill returned to his apartment, and, when the police arrived, he surrendered without incident and immediately requested an attorney.

Officer Deny Oesterling transported Mr. Spruill to the police station and escorted him to the station's interrogation room. At Mr. Spruill's request, Officer Oesterling remained with Mr. Spruill in the interrogation room while waiting for the assigned detectives. Officer Oesterling testified that during the drive to the station and while the pair sat together in the interrogation room, Mr. Spruill offered several unprompted comments about the shooting, some of which were captured in a recording initiated surreptitiously by Officer Oesterling.

An hour later, Detectives Corey Lambrecht and Derek Hopkins turned on the interrogation room's videotape recorder and entered the room, relieving Officer

3

Oesterling. Mr. Spruill conversed with Detectives Lambrecht and Hopkins for about twenty minutes, during which time he made some inculpatory statements. The following exchange then occurred between Detective Lambrecht and Mr. Spruill; it is quoted at length, as it is a focal point of the instant appeal:

> 1:12:00: Spruill: I'm hanging out with Elizabeth. I'm hanging out with Roger and their son David. I say David, you know . . . Roger lives there but don't even smoke pot. I say David you know he's what 18 years old I'm like (makes smoking gesture) "smoke a little dope?" you know what I mean that's . . . that's what I'm guilty of but I'll be the first one to say hey how'd we catch Al Capone after we went you know wet again we caught him by tax evasion. Pot there ain't nothing wrong with it and you both know it. And I know you know it. Ummmm (laughs) I just happened to be drunk and uhhh I heard what I hear every goddamn night and I was drunk and as we all know a drunk man's words are a sober man's thoughts. So, I went down there. And I was out of line. And I was meeted with (points at neck) that . . . and this (points at arms) . . . marks. He grabbed me and was just attacked me. Threw me on the ground. But he had me by the throat and I'm thinking (makes choking noises). Alright and (laughs) and like I'm such a pussy, like you know that's . . . that's being a drunk. You knock on looking for trouble the next thing and you're like alright, woof, hands up, I'm sorry bro, I didn't mean to. He didn't stop. Well, I'm a law abiding citizen, I have a permit to carry a piece. I'm being attacked and it was just as easy as that . . . as you know Detective Lambrecht. (Makes gesture as if he's holding a gun and pulling the trigger) Goo, goo, goo, goo. (shrugs) That's all I gotta say.

> 1:13:33: Lambrecht: Ethan, ummm, first of all, I appreciate you talking and explaining what happened. I'm glad you gave your side of the story. I'd love to ask you some more details about this.

> 1:13:44: Spruill: Ask me right now! You're just gonna throw me in a cell?

> 1:13:48: Lambrecht: Do what?

> 1:13:49: Spruill: You're just gonna throw me in a cell?

> 1:13:50: Lambrecht: Heck no! No. I got all night. Ummm . . . because the officers brought you here . . . uhhh . . . you're in custody, you're in investigative detention.

4

1:13:58: Spruill: That's alright[.]

1:13:59: Lambrecht: You need to understand your *Miranda* rights before I can ask you some detailed questions.

1:14:01: Spruill: Can I? Ok well see . . . I've trusted . . . . I've given y'all enough benefit of the doubt. And I've[.] But since the beginning I've said where's Frank Corbois? I need my lawyer here. But I've I've understand . . . and I've said . . . I respect y'all and I'll tell you anything, but you're right tell me . . . how you . . . ughhh . . . I'm a smart kid, I'm an honor student, I'm an . . . uhhh you fucking know what I mean, a ughh . . . . . .

1:14:24: Lambrecht: You sound very smart. No, I . . . uhh . . . you're very intelligent and I appreciate (Spruill begins speaking at this point 1:14:27) . . . everything you've said.

1:14:27 Spruill (talking at the same time as Lambrecht): I understand *Miranda* Rights . . . I just

1:14:30: Lambrecht: And I'm not . . . you know first of all, this is the first I've heard of you asking for a lawyer just to be clear.

1:14:34: Spruill: Oh no no, because this is the first I've talked to you. I've been talking to other people all night long. Yeah.

1:14:38: Lambrecht: Did you? Ok. Well . . . but nobody's sat you down and asked you questions?

1:14:42: Spruill: No, and I just happened to take to Deny. And Deny I said Deny stay with me tonight. Deny, I trust you. I know that you work for the man, which you all do and I've got friends who come in the meat market who are homicide detectives in Oklahoma City, but I looked at Deny and I saw his eyes man, you're alright, stay with me, please like, I don't know y'all and for all . . . and and I've dealt with enough cops to know that it doesn't matter how real and how compliant you are all you care about . . . throw his ass in jail, he fucking shot somebody, it doesn't matter like that's what I know you guys as.

1:15:17: Lambrecht: If that were the case, you'd already be booked in. I definitely want to get more . . . a few more details from you[.]

1:15:23: Spruill: Ask me. Ask me, please.

5

1:15:24: Lambrecht: Well, by law and I respect you and I respect your (can't hear this part because Spruill talks at same time)

1:15:26 Spruill: (Talking at same time as Lambrecht) I need a lawyer

1:15:28 Lambrecht: Well no, no. You have the right to refuse a lawyer and waive your *Miranda* Rights.

1:15:33: Spruill: I ain't gonna do that. I ain't gonna do that. That's fine. No, no, no. I know you're not pushing me. And no, I know. No.

1:15:39: Lambrecht: The . . . I can't ask you questions unless you waive your *Miranda* Rights.

1 1:15:43: Spruill: So I got . . . I gotta have a law . . . ok, that's fine then I'm alright. Then so . . . .

1:15:46: Lambrecht: I'm not gonna sit here and ask you questions. I mean you said this is . . . you're . . . you're . . . you know . . . you're saying this is self-defense, etc. and if that's the case there's definitely a lot of questions I need to ask you (Ethan interrupts)

1:15:53: Spruill: Well well, no no, he . . . . yeah

1:15:55: Lambrecht: but But if you don't want me to ask you the questions, I won't. I mean

1:15:59: Spruill: Well see here's the thing. Can . . . can you just be straight up with me without me signing a piece of paper?

1:16:04: Lambrecht: Well, no no, I need you to make sure that you're aware of your *Miranda* Rights[.]

1:16:07: Spruill: Oh, I'm aware. Yeah, you have a right to remain silent. You know what I mean? I understand all that[.]

1:16:10: Lambrecht: I totally get it, but here I need you, under the circumstances I need you to sign that you're aware of it[.]

1:16:16: Spruill: (drinking coffee) Mmmhmmm

6

> 1:16:18: Lambrecht: Cause if it were me, I mean, if I uhhhh had shot somebody and I'm claiming self-defense . . . again I wasn't there I'm just trying to interview everyone to figure out what happened. You know if it were me and it was truly 100% self-defense, I'd . . . I'd be wanting to talk to everyone (Can't hear the rest because Spruill begins to speak)
>
> 1:16:30: Spruill: Officer, if it was truly self-defense, it would have been him banging on my door. That's where I fucked up. Is that I went looking for them. [. . .]

App., Vol. I at 127–29 (ellipses in original).

### *B. Procedural History*

The State ultimately charged Mr. Spruill with first-degree murder. The trial court denied Mr. Spruill's motion to suppress the recordings documenting his custodial statements, and the recordings were presented at trial.

The jury rejected Mr. Spruill's self-defense theory, but declined to convict him of first-degree murder, instead finding he committed the lesser-included offense of first-degree manslaughter. The jury recommended a 23-year sentence, which the trial court imposed. Mr. Spruill appealed.

### 1. OCCA's Decision to Admit Mr. Spruill's Statements

On direct appeal to the Oklahoma Court of Criminal Appeals ("OCCA"), Mr. Spruill raised three constitutional challenges to the validity of his conviction, including a claim that he was deprived of his privilege against self-incrimination by the admission at trial of custodial statements made in response to police interrogation. By summary opinion, the OCCA rejected each challenge and affirmed his conviction.

The OCCA reasoned, in relevant part, as follows:

7

The trial court did not abuse its discretion in denying the motion to suppress [Mr. Spruill's] statements. *Johnson v. State*, 2012 OK CR 5, ¶ 11, 272 P.3d 720, 726 (reciting standard of review for motion to suppress); *Mitchell v. State*, 2011 OK CR 26, ¶ 13, 270 P.3d 160, 169 (same). "The Fifth Amendment right [to counsel] arises when one who is in custody is interrogated." *Taylor v. State*, 2018 OK CR 6, ¶ 6, P.3d (citing *Miranda v. Arizona*, 384 U.S. 436, 469–70, 86 S. Ct. 1602, 1625–26, 16 L. Ed. 2d 694 (1966)). "Under *Miranda*, no statement obtained through custodial interrogation may be used against a defendant without a knowing and voluntary waiver of those rights." *Taylor*, 2018 OK CR 6, ¶ 6 (citing *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612).

The record shows that [Mr. Spruill] was in custody at the time of his various recorded statements; that [Mr. Spruill] requested the presence of counsel repeatedly starting at the moment he was arrested in front of his apartment; that [Mr. Spruill's] statements were unwarned—that is, authorities never read him the warning mandated by *Miranda*, 384 U.S. at 479, 86 S. Ct. at 1630; and that [Mr. Spruill] refused to sign any waiver indicating that he understood his rights. However, the record also shows that [Mr. Spruill's] statements were not made in response to interrogation from authorities. *See Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S. Ct. 1682, 1689-90, 64 L. Ed. 2d 297 (1980) (the term "interrogation" for *Miranda* purposes "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."). Rather, [Mr. Spruill's] statements were volunteered to virtually anyone who would listen while he was at the police department. Volunteered statements of any kind are not barred by the Fifth Amendment. *Miranda*, 384 U.S. at 478.

"Once a suspect in custody has asserted his right to speak only through counsel, all attempts at interrogation must cease. A suspect can, however, change his mind and decide to speak to police without counsel." *Underwood v. State*, 2011 OK CR 12, ¶ 31, 252 P.3d 221, 238 (internal citation omitted). Here, the State met its burden to prove that [Mr. Spruill's] statements were the product of an essentially free and unconstrained choice by [Mr. Spruill]. *Id.*, 2011 OK CR 12, ¶ 33, 252 P.3d at 238. There is no constitutional prohibition to admission of these statements at trial despite [Mr. Spruill's] requests for counsel, *see Frederick v. State*, 2001 OK CR 34, ¶¶ 92–93, 37 P.3d 908, 934, or his intoxication. *Coddington v. State*, 2006 OK CR 34, ¶ 38, 142 P.3d 437, 448. [Mr. Spruill's] argument that he was uninformed of his rights and fearful of the authorities when he made these statements is also not supported by the record.

8

App. Vol. I, at 86–88.

## 2. District Court's Decision

Less than a year later, Mr. Spruill filed the instant habeas petition in federal

district court, raising the same three constitutional challenges rejected by the OCCA. The

district court denied relief on all three claims, and further declined to grant Mr. Spruill a

COA. Regarding the self-incrimination claim, the district court reasoned as follows:

> After careful consideration of the record, the Court finds that [Mr. Spruill] has failed to overcome the presumption of correctness of the OCCA's findings. [Mr. Spruill] concedes "there were some volunteered statements," and argues in a conclusory manner "there were numerous incriminating statements that were obtained over objection, contrary to Supreme Court precedents." [Mr. Spruill] does not point to clear and convincing evidence that any particular statement was not volunteered or any particular request for counsel was not abandoned. [Mr. Spruill] instead contends the police officers "strategically engaged in conduct specifically designed to cause [him] to make incriminating statements in their presence" and this "calculated scheme . . . [was] the functional equivalent of questioning" as defined by the Supreme Court in *Innis*. However, the OCCA unequivocally rejected [Mr. Spruill's] view of the evidence; the OCCA expressly found that his incriminating statements "were not made in response to interrogation" and, in so doing, specifically referenced *Innis* and its definition of "the term 'interrogation' for *Miranda* purposes." The Court finds that [Mr. Spruill] has failed to show that the OCCA made an unreasonable determination of the facts when it found that [Mr. Spruill] volunteered his incriminating statements.

App. Vol. I, at 74–75 (citations omitted) (ellipsis in original).

## 3. This Court's COA Decision

Mr. Spruill timely sought a COA from this court, which we granted as to

Mr. Spruill's Fifth Amendment self-incrimination claim and denied as to his other two

9

claims. We ordered briefing addressing the merits of self-incrimination claim, and we now resolve the claim on its merits.

## II.    STANDARD OF REVIEW

Mr. Spruill raised his first self-incrimination claim on direct appeal, and the OCCA denied the claim on its merits. Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a petition for writ of habeas corpus will not be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).

"A state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case certainly would qualify as a decision 'involv[ing] an unreasonable application of . . . clearly established Federal law.'" *Williams v. Taylor*, 529 U.S. 362, 407–08 (2000) (alterations in original) (quoting 28 U.S.C. § 2254(d)(1)). The inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. "For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Williams*, 529 U.S. at 410); *see also White v. Woodall*, 572 U.S. 415, 419 (2014)

10

("[C]learly established federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of th[e Supreme] Court's decisions. And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice." (alterations in original) (internal citations and quotation marks omitted)).

The standard set by AEDPA was designed to be "difficult to meet." *Richter*, 562 U.S. at 102.

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further. Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Id.* at 102–03 (citations and parentheticals omitted); *see also Burt v. Titlow*, 571 U.S. 12, 20 (2013) ("We will not lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction[]' for which federal habeas relief is the remedy." (quoting *Richter*, 462 U.S. at 102)).

A state court's "factual determinations are presumed correct absent clear and convincing evidence to the contrary." *Howell v. Trammell*, 728 F.3d 1202, 1228 (10th Cir. 2013) (citing 28 U.S.C. § 2254(e)(1)); *see also Wood v. Allen*, 558 U.S. 290, 301

11

(2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.").

## III. ANALYSIS

Mr. Spruill argues that both 28 U.S.C. § 2254(d)(1) and (d)(2) are implicated by the OCCA's decision to admit inculpatory statements he made while in police custody. First, he asserts that he is entitled to relief under 28 U.S.C. § 2254(d)(1) chiefly because the OCCA unreasonably applied the Supreme Court's decision in *Rhode Island v. Innis*, 446 U.S. 291 (1980). Second, he argues that he is entitled to relief under 28 U.S.C. § 2254(d)(2) because the OCCA's decision was based on an unreasonable determination of the facts in light of the evidence presented at trial. Specifically, Mr. Spruill states the evidence showed that although he repeatedly requested counsel, he was never given *Miranda* warnings nor provided with counsel before being interrogated.[2]

> In support of his argument, Mr. Spruill highlights the following language in *Innis*:
>
> [T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Innis*, 446 U.S. at 300–01 (footnotes omitted).

---

[2] Although Mr. Spruill suggests his latter argument falls under 28 U.S.C. § 2254(d)(2), rather than (d)(1), he does not dispute the factual findings in his case. To the extent Mr. Spruill argues that the police officers' statements and conduct constituted an "interrogation," his objection to the OCCA's decision is not a factual one but rather an objection to the application of law to the facts in his case.

12

The relevant facts in *Innis* were as follows. A taxicab driver who had been robbed by a man wielding a sawed-off shotgun identified a picture of Mr. Innis as that of his assailant. *Id.* at 293. A police officer spotted Mr. Innis, who was unarmed, arrested him, and advised him of his *Miranda* rights. *Id.* at 293–94. When other officers arrived at the arrest scene, Mr. Innis was twice again provided with *Miranda* warnings, after which he told officers that he wished to speak with a lawyer. *Id.* at 294. Mr. Innis was then placed in a police vehicle with three officers and driven to the police station. *Id.* While en route to the station, two of the officers engaged in a conversation between themselves concerning the missing shotgun. *Id.* at 294–95. One of the officers stated that there were "a lot of handicapped children running around in this area," and "God forbid one of them might find a weapon with shells and they might hurt themselves." *Id.* Mr. Innis interrupted the conversation, stating that the officers should turn the police car around so he could show them where the gun was located. *Id.* at 295. Upon returning to the scene of the arrest, where a search for the shotgun was in progress, Mr. Innis was again advised of his *Miranda* rights. *Id.* He replied that he understood those rights but stated that he "wanted to get the gun out of the way because of the kids in the area," and he then led the police to the shotgun. *Id.*

The Supreme Court held that Mr. Innis was not interrogated, within the meaning of *Miranda*. *Id.* at 302. The Court first noted that "the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation." *Id.* at 300. It went on to define "interrogation" using the language quoted *supra*. Applying that definition to the

13

facts before it, the Court held that "[i]t cannot be said . . . that [the officers] should have known that their conversation was reasonably likely to elicit an incriminating response" from Mr. Innis. *Id.* at 302. It reasoned that there was "nothing in the record to suggest that the officers were aware that [Mr. Innis] was peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children," nor to suggest that the police knew that he was "unusually disoriented or upset at the time of his arrest." *Id.* at 302–03. The Court further contrasted the officers' conversation, which consisted of "no more than a few off hand remarks," with a "lengthy harangue in the presence of the suspect." *Id.* at 303. Finally, the Court rejected Mr. Innis's contention that, under the circumstances, the officers' comments were "particularly evocative." *Id.* (internal quotation marks omitted). Although the Court acknowledged that Mr. Innis was "subjected to subtle compulsion," it concluded that this compulsion could not be equated to interrogation—it was neither express questioning nor its "functional equivalent." *Id.* at 300–03.

Here, Mr. Spruill argues that Detective Lambrecht's "infamous statement"—"'if it were me and I'd shot someone claiming to be self-defense, . . . I'd be wanting to talk to everyone'"—constituted interrogation after Mr. Spruill had requested counsel and had not waived his right thereto. Aplt. Reply Br. at 7 (quoting App. Vol. I, at 129). He further points out that "[c]ontrary to the facts in [his] case, Mr. Innis was given his full *Miranda* warnings four (4) times" before making inculpatory statements; Mr. Spruill "was never given *Miranda* warnings." Aplt. Br. at 17–18.

Although we found that Mr. Spruill's self-incrimination claim was "debatable" for COA purposes,[3] we cannot conclude that he is entitled to relief under the highly deferential standard we must apply to the state court's adjudication on the merits of his claim. The OCCA correctly identified the governing legal rules. Specifically, it noted that (1) under *Miranda* and its progeny, no statement obtained through custodial interrogation may be used against a defendant without a knowing and voluntary waiver of those rights; (2) an "interrogation" for *Miranda* purposes refers not only to express questioning by police, but also to other words and actions that are reasonably likely to elicit an incriminating response; and (3) once a suspect in custody has asserted his right to speak only through counsel, all attempts at interrogation must cease. Based on its review of the record, the OCCA concluded that Mr. Spruill's custodial statements "were not made in response to interrogation," thereby removing them from the Fifth Amendment's protective ambit. App. Vol. I, at 87. Rather, his "statements were volunteered to virtually anyone who would listen while he was at the police department." *Id.* It accordingly affirmed the trial court's denial of Mr. Spruill's motion to suppress these statements.

This ruling was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded

---

[3] As noted in our previous decision, under AEDPA, a COA may issue if a petitioner "demonstrate[s] that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). A "claim can be debatable [for COA purposes] even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Buck v. Davis*, 137 S. Ct. 759, 774 (2017) (quoting *Miller-El*, 537 U.S. at 338).

disagreement." *Richter*, 562 U.S. at 103. The record confirms that Mr. Spruill was talkative with the officers, especially in conversations with Officer Oesterling, whom Mr. Spruill repeatedly asked to remain with him in the interrogation room. In response to Detective Lambrecht's question whether any officer had "sat you down and asked you questions," Mr. Spruill responded "No, and I just happened to take to Deny [*i.e.*, Officer Oesterling]. And . . . I said Deny stay with me tonight." App. Vol. I, at 128. Mr. Spruill was also loquacious with Mr. Lambrecht, at one point speaking to him in a seeming stream of conscious for over a minute and a half, with his statements flowing uninterrupted from an admission to smoking marijuana earlier in the evening, to commentary on how Al Capone was apprehended, to a description of the altercation between himself and Mr. McCray. *Id.* at 127.

Regarding Detective Lambrecht's statement that if he were "claiming self-defense . . . [he'd] be wanting to talk to everyone," App. Vol. I, at 129, there is a possibility for fairminded disagreement as to whether Mr. Lambrecht should have known that this comment was "reasonably likely to elicit an incriminating response" from Mr. Spruill, under the circumstances of this case. *Innis*, 446 U.S. at 301. Mr. Lambrecht's comment could be construed—and apparently was construed, by the OCCA—as more analogous to an "off hand remark[]" constituting "subtle compulsion," than to "express questioning or its functional equivalent" constituting interrogation. *See id.* at 301–03. It was certainly a far cry from the "lengthy harangue in the presence of [a] suspect" that the *Innis* court distinguished, and in light of Mr. Spruill's previous loquaciousness with the officers on all manner of topics, it cannot necessarily be said that the comment was "particularly

16

evocative," under the circumstances. *Id.* Thus, even if this court might have decided otherwise had we considered the issue de novo, the OCCA's conclusion that Mr. Lambrecht's statement did not qualify as "interrogation," in the context of the record as a whole, was not an unreasonable application of Supreme Court precedent, including *Innis*. And because Mr. Spruill was not subjected to an interrogation, *Miranda* did not require suppression of his custodial statements.

In sum, Mr. Spruill has not shown that the OCCA's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. As such, we may not grant federal habeas relief.

## IV.  CONCLUSION

For the reasons stated, we **AFFIRM** the district court's decision denying Mr. Spruill's 28 U.S.C. § 2254 petition for a writ of habeas corpus.

Entered for the Court


Carolyn B. McHugh
Circuit Judge

17