FILED
United States Court of Appeals
Tenth Circuit

March 19, 2019

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

RAYMOND EUGENE JOHNSON,

Petitioner - Appellant,

v.

MIKE CARPENTER, Warden,
Oklahoma State Penitentiary,[*]

Respondent - Appellee.

No. 16-5165

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. NO. 4:13-CV-00016-CVE-FHM)

Thomas D. Hird, Assistant Federal Public Defender (Sarah M. Jernigan, Assistant
Federal Public Defender, with him on the briefs), Office of the Federal Public
Defender, Oklahoma City, Oklahoma, for Petitioner-Appellant.

Jennifer L. Crabb, Assistant Attorney General (Mike Hunter, Attorney General of
Oklahoma, with her on the brief), Office of the Attorney General, Oklahoma City,
Oklahoma, for Respondent-Appellee.

Before **TYMKOVICH**, Chief Judge, **LUCERO**, and **MATHESON**, Circuit
Judges.

[*] Pursuant to Fed. R. App. P. 43(c)(2), Terry Royal is replaced by Mike
Carpenter as the Respondent in this case.

**TYMKOVICH**, Chief Judge.

Oklahoma charged Raymond Johnson with one count of first-degree arson and two counts of first-degree murder for the deaths of his former girlfriend, Brooke Whitaker, and the couple's seven-month-old daughter. The charges stemmed from Johnson's brutal attack on Whitaker with a hammer, after which he doused her with gasoline and set her house on fire, killing both victims. The jury convicted Johnson on all three counts. The Oklahoma jury subsequently concluded that the mitigating evidence did not outweigh four aggravating circumstances surrounding the murders. The jury sentenced Johnson to death.

Johnson has since sought to overturn his sentence first in Oklahoma state court and now in federal court. In this habeas petition filed under 28 U.S.C. § 2254, Johnson alleges ineffective assistance of trial and appellate counsel. The district court denied relief, and we granted a certificate of appealability on four issues: (1) whether Johnson's appellate counsel was ineffective for failing to challenge the exclusion of certain mitigating evidence; (2) whether his trial counsel was ineffective for failing to investigate and develop certain mitigating evidence and present additional witnesses, and whether his appellate counsel was ineffective for failing to raise the issues on direct appeal; (3) whether Johnson's

appellate counsel was ineffective for failing to raise claims of prosecutorial misconduct; and (4) cumulative error.[**]

Under the Antiterrorism and Effective Death-Penalty Act, we may grant Johnson habeas relief only if the Oklahoma Court of Criminal Appeals unreasonably applied federal law in denying his claims. 28 U.S.C. § 2254(d)(1). This is not a burden Johnson can satisfy here.

We therefore AFFIRM the district court's denial of Johnson's petition for a writ of habeas corpus.

## I. Background

Raymond Johnson lived with his girlfriend Brooke Whitaker and their infant daughter for several months in 2007. During that time Johnson also became involved with another woman, Jennifer Walton, and he decided to move out of Whitaker's house in June 2007, staying for a time in a homeless shelter. By the time Johnson and Whitaker broke off their relationship, Walton was already pregnant with Johnson's child.

---

[**] We deny Johnson's motion to expand his certificate of appealability to include a claim that the trial court's jury-selection process violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. We agree with the district court that no reasonable jurist could grant relief on the claim and, therefore, the issue is not "adequate to deserve encouragement to proceed further." *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citation omitted).

On June 22, 2007, Walton dropped Johnson off at Whitaker's home so he could retrieve some clothing. Instead of picking up his clothes and leaving, Johnson waited at the house until the early morning hours when Whitaker returned from work. The two got into an argument, and according to the information Johnson later gave police, Whitaker got a knife and threatened to stab him. Johnson responded by striking her on the head with a hammer. Whitaker fell to the floor and begged Johnson to call 911. He refused because he did not want to return to prison. He instead delivered at least five more blows to the head with the hammer, went to the outside shed to retrieve a gasoline can, and doused Whitaker and the house in gas—including the room where the baby slept. Johnson then lit Whitaker on fire and fled.

Johnson called Walton and asked her to pick him up behind Whitaker's house. He told Walton when she arrived that a friend had killed Whitaker with a hammer. Walton later recalled that Johnson had blood on his clothes and he smelled like gasoline. She also recalled noticing smoke pour out of Whitaker's front window. Johnson afterward asked Walton to drive him back to Whitaker's still-burning house so he could search for Whitaker's cell phone, which he had used to call Walton, because he was afraid he had left fingerprints on it. Johnson searched outside the house for the phone when they returned, but he could not find it.

Firefighters arrived at Whitaker's house shortly after 11:00 a.m. on June 23, 2007. The house was completely filled with smoke, and when they ventilated the house they found Whitaker's seven-month-old daughter behind a couch. The infant was dead. Firefighters also found Whitaker unconscious with extensive burns on her body. Paramedics reestablished a pulse, and she was rushed to the hospital. Shortly after arriving, Whitaker died. The medical examiner later determined that she died of blunt force trauma to the head and smoke inhalation.

Investigators found Whitaker's cell phone in the living room and discovered that two calls had been placed to Jennifer Walton. Police interviewed Walton the same day, and she acknowledged what she knew. Police then set up surveillance around the house where Johnson was staying and arrested him as he left the house that same evening. He waived his Miranda rights and confessed to killing Whitaker and attempting to burn down the house.

The evidence that Johnson committed the murders was significant, so his trial essentially proceeded as a second-stage sentencing case. The government argued Johnson deserved the death penalty based on four aggravating circumstances: (1) Johnson knowingly presented a great risk of death to more than one person; (2) the murders were especially heinous, atrocious, or cruel; (3) Johnson was previously convicted of a violent felony; and (4) he posed a continuing threat to society. *See* 21 Okla. Stat. § 701.12; Johnson stipulated to

the third factor since he had previously served ten years in prison for first-degree manslaughter. The government supported the other three factors by presenting evidence that investigators found gasoline on the infant's diaper, inferring that Johnson intended to kill both victims. The government also argued Whitaker had suffered significantly; she cried out in horrible pain after Johnson repeatedly struck her, and blood evidence from the scene confirmed that Whitaker retained consciousness and moved even after Johnson lit her on fire.

Attempting to avoid the death penalty, Johnson's trial counsel presented nine witnesses, most of whom testified that during his previous stint in prison Johnson was an effective Christian preacher and had organized church events and choirs. Trial counsel sought to demonstrate with this evidence that within the structured environment of prison, Johnson could help other prisoners develop and progress through religious activity. Jurors should spare Johnson's life, counsel argued, so he could accomplish this mission.

In the end, the jury found in favor of all four aggravating factors, found that the mitigating circumstances did not outweigh the aggravating factors, and voted to impose the death penalty. The Oklahoma Court of Criminal Appeals (OCCA) affirmed Johnson's conviction and sentence on direct appeal. *See Johnson v. State*, 272 P.3d 720 (Okla. Crim. App. 2012).

Johnson later filed a petition for post-conviction relief with the OCCA alleging the same claims of ineffective assistance of trial and appellate counsel he asserts here. The OCCA denied his petition in an unpublished opinion. *See Johnson v. State*, No. PCD-2009-1025, slip op. (Okla. Crim. App. Dec. 14, 2012). Johnson filed a second post-conviction petition, which the OCCA denied on procedural grounds. *See Johnson v. State*, No. PCD-2014-123, slip op. (Okla. Crim. App. May 21, 2014). The court stated that Oklahoma law requires a petitioner to file a second post-conviction petition within sixty days of when a claim against post-conviction counsel could have been discovered with the exercise of reasonable diligence. *Id.*

Seeking federal relief, Johnson filed a 28 U.S.C. § 2254 habeas petition in the Northern District of Oklahoma, setting out the six claims originally presented to the OCCA in his first post-conviction petition. The district court denied relief. The district court did, however, issue a certificate of appealability on three grounds dealing with ineffective assistance of trial and appellate counsel. We agreed to hear those claims and granted a certificate on one additional issue, cumulative error.

We ultimately agree with the district court that no relief is warranted. The OCCA reasonably applied federal law in denying Johnson's post-conviction petition, so we affirm the district court's dismissal of his § 2254 petition.

-7-

# II. Analysis

Johnson alleges three errors at trial and on direct appeal: (1) that the jury should have seen and heard certain additional evidence the court excluded, including photographs, an audio recording, and a video; (2) that trial counsel should have investigated and developed certain mitigating evidence and presented additional witnesses, and that appellate counsel should have raised these failings on direct appeal; and (3) that the prosecutor misstated the law surrounding mitigating evidence. He brings all these claims (as he must, given the posture of the case), through the lens of ineffective assistance of counsel. He also brings a cumulative error claim, contending that even if individually the failings of trial and appellate counsel did not render his trial unfair, the cumulative effect of the errors did.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this case. AEDPA "circumscribes our review of federal habeas claims that were adjudicated on the merits in state-court proceedings." *Hooks v. Workman*, 689 F.3d 1148, 1163 (10th Cir. 2012). Under AEDPA, a federal court may grant relief to a state prisoner only if he has established

> that the state court's adjudication of the claim on the merits (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

*Littlejohn v. Trammell*, 704 F.3d 817, 824 (10th Cir. 2013) (quoting 28 U.S.C. § 2254(d)).

This standard is "highly deferential [to] state-court rulings" and demands that those rulings "be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam). "If this standard is difficult to meet, that is because it was meant to be. . . . It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents. It goes no further." *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (citations omitted).

The burden on the petitioner is particularly difficult when he is pursuing an ineffective assistance of counsel claim. This is because the state court must unreasonably apply *Strickland v. Washington*, 466 U.S. 668 (1984). A *Strickland* claim will be sustained only when (1) "counsel made errors so serious that counsel was not functioning as 'counsel'" and (2) "the deficient performance prejudiced the defense." *Id.* at 687. Thus, "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial." *Richter*, 562 U.S. at 105 (citations omitted).

Federal courts, therefore, "must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* Our only task, then, is to determine whether reasonable jurists could agree with the OCCA that Johnson's trial and appellate counsels acted reasonably. *See id.* AEDPA allows us to go no further.

### A. Exclusion of Evidence

Johnson first contends that his appellate counsel failed to appeal the district court's error in excluding certain mitigating evidence. The trial court excluded on various grounds (1) two of five photographs of Johnson with his family, (2) all but a thirty-second excerpt of Johnson singing Christian music in a prison quintet while previously incarcerated, and (3) a video of Johnson preaching to a prison congregation.

To succeed on his claim of ineffective assistance of appellate counsel under the Sixth Amendment, Johnson must establish "both constitutionally deficient performance and prejudice as required by *Strickland*." *Moore v. Gibson*, 195 F.3d 1152, 1180 (10th Cir. 1999). This means that a court cannot find ineffective assistance of appellate counsel unless there is "a reasonable probability the omitted claim would have resulted in relief" on direct appeal, *Neill v. Gibson*, 278

F.3d 1044, 1057 n.5 (10th Cir. 2001), because there can be neither deficient performance nor prejudice "[i]f the underlying issue was not valid," *English v. Cody*, 241 F.3d 1279, 1283 (10th Cir. 2001).

On this issue the OCCA addressed only the second prong of *Strickland*, holding that Johnson failed to affirmatively show prejudice resulting from his appellate counsel's omission. The district court agreed. It held that in light of the aggravating evidence, Johnson could not show a reasonable probability that the jury would have reached a different result. After reviewing the record on these issues, we agree that even if the trial court erred in excluding the mitigating evidence, the OCCA reasonably held that Johnson cannot affirmatively prove prejudice. We therefore affirm the district court's holding.

Johnson sought to admit five photographs of him with his family. The trial court allowed three. The court admitted a photograph of Johnson's son and one of Johnson with his mother and sisters. But the court excluded another photo of him with his mother and sisters for cumulativeness and instructed Johnson to pick between two pictures of him as a child with his step-father and sisters. The jury consequently saw evidence that Johnson had a son and viewed at least one photograph of Johnson with every member of his family. We can say with confidence, therefore, that the OCCA reasonably concluded that two largely

cumulative photographs would not have altered Johnson's sentence and appellate counsel could not have been ineffective for omitting this claim on direct appeal.

So too with the claim that the jury should have heard more of Johnson's proffered audio recording. Johnson sought to admit a recording featuring him singing in a gospel quintet while incarcerated for manslaughter. The trial court instructed counsel to play for the jury "a portion [of a song] that you think is appropriate." R., Vol. Tr. X at 1967. Defense counsel elected to play a thirty-second excerpt of the quintet singing *Now Behold the Lamb*. Johnson now argues that the jury ought to have heard the whole CD (or at least the entire song). He fails to adequately explain, however, how listening to more than thirty seconds would have changed the jury's decision. He argues only that "[w]hat may resonate varies from juror to juror," so presumably, in Johnson's view, some juror could have been moved by a longer excerpt. Aplt. Br. at 19.

This reasoning would be on stronger footing if the court had excluded the recording entirely. But the thirty-second excerpt would have confirmed witness testimony that Johnson had an appealing voice, and any juror who might have been moved by Johnson's singing was able to hear his voice. The OCCA was well within the realm of reasonableness to find no "reasonable probability that at least one juror would have struck a different balance." *Hooks*, 689 F.3d at 1202.

Thus, appellate counsel could not have been ineffective for failing to flag the issue on direct appeal.

The exclusion of the video of Johnson preaching in prison is more complex, but we ultimately agree that the OCCA's lack-of-prejudice finding is reasonable. Defense counsel sought to admit a video of Johnson preaching a Christian sermon while serving his prior prison sentence. In this video Johnson passionately urges the audience to do to Satan what a prison inmate would do to a cockroach (i.e., crush him), remarking that "[t]he only power that Satan has is what you give him." Aplt. Br. at 20. Johnson argues here that the video would have helped jurors visualize his dynamic style of preaching and recognize the good he could do for other prison inmates, thus rebutting the continuing threat aggravator.

Unlike the photographs and CD recording, Johnson's video was not cumulative of other evidence. Granted, the jury would not have heard any relevant, new information from the video since witnesses testified that Johnson was a preacher. But a video would likely have had a somewhat different effect on the jurors than mere witness testimony—as even the OCCA has recognized. *See Coddington v. State*, 142 P.3d 437, 460 (Okla. Crim. App. 2006) (explaining that fact finders might "gain greater insight" from audio-visual devices).

This does not automatically mean, however, that Johnson's appellate counsel was ineffective for failing to argue it on appeal. Johnson still has to

-13-

prove prejudice resulting from his counsel's omission. And after reviewing the video and the rest of the record we conclude the OCCA reasonably determined Johnson failed to prove prejudice.

Johnson cannot prove prejudice because almost the entirety of Johnson's mitigation defense centered on his potential for doing good in prison, especially his potential for assisting other inmates to find religion. This included witnesses who testified that he preached sermons while in prison. Specifically, the jury heard significant testimony about Johnson's involvement in the church and his activities to help others. The jury heard from one of Johnson's friends from prison that Johnson was a "light" to his fellow inmates. R., Vol. X at 2020. A prison minister testified that Johnson "had a very awesome impact" on her ministry efforts, encouraging inmates to attend services. R., Vol. X at 2035–36. The jury also heard from another prisoner that Johnson participated in a group designed to mentor troubled high school students, and that he actively participated in the church and encouraged others to do so. Another witness, Reverend Vernon Burris, noted that Johnson ministered effectively because he motivated people with his example.

These accounts of Johnson's participation in prison ministries do not render the video cumulative. But the information the jury *did* hear certainly reduces the prejudice Johnson suffered. The jury, in other words, heard significant testimony

that outlined Johnson's religious activities in prison and detailed his efforts to assist others to find religious conviction. And yet the jury still found that this mitigating evidence did not outweigh the aggravating circumstances.

Johnson contends in response that the video would have rebutted the prosecution's suggestion that his heart was not in his preaching. The jury needed to see the video, in Johnson's view, to confirm Johnson's sincerity. But Johnson's own religious conviction and sincerity was not the basis for showing the video. The recording fit into trial counsel's larger defense by demonstrating Johnson's talent for preaching and accordingly his ability to positively influence other inmates. And to the extent that evidence of Johnson's religious sincerity would have moved certain jurors, the video would have been rather weak evidence since the recording occurred well before the murders— while he was in prison for his first murder—calling into question Johnson's later religious sincerity. The subsequent murders also stand in stark contrast to his prison exhortations.

The OCCA reasonably concluded, therefore, that Johnson's direct-appeal counsel was not ineffective for omitting the issue because viewing the video would not have changed the jury's determination.

### B. *Failure to Investigate, Develop, and Present Mitigating Evidence*

Johnson next contends that his trial counsel failed to investigate, develop, and present additional mitigating evidence in the form of witnesses who could testify about his life and background. And because appellate counsel did not raise this issue on direct appeal, Johnson adds an ineffective assistance of appellate counsel claim. Johnson must establish both deficient performance and prejudice for each of these claims. *Moore*, 195 F.3d at 1180. We look to trial counsel's conduct for both claims, for Johnson cannot fault appellate counsel for failing to raise nonmeritorious claims on direct appeal. *See English*, 241 F.3d at 1283.

The OCCA addressed Johnson's arguments and concluded that he could show neither deficient performance nor prejudice. The court concluded Johnson had not shown that trial counsel did not know the information Johnson now asserts counsel should have investigated further. And the court reasoned that Johnson's trial attorney's strategy was reasonable. The court noted that trial counsel's failure to call a few of Johnson's potential witnesses "precluded the jury from hearing first-hand some positive accounts of Johnson's life, it also precluded the jury from hearing some negative testimony about Johnson such as testimony about his earlier contacts with police and his possible gang affiliation as a teenager." *Johnson*, No. PCD-2009-1025, slip op. at 10.

The federal district court denied relief on this claim, and we affirm. Trial counsel had reasonable strategic reasons for presenting only the nine witnesses who testified during the mitigation stage, and the record contradicts Johnson's assertion that trial counsel failed to investigate other possible defense strategies. We therefore cannot conclude the OCCA unreasonably applied *Strickland* when it denied Johnson's claim.

### 1. Ineffective Assistance of Trial Counsel

Johnson offers two shades of the same claim that his trial counsel failed to investigate, develop, and present mitigating evidence for his second-stage trial. He first contends that trial counsel failed to present to the jury "the whole Raymond." Aplt. Br. at 68–69. His attorney selected witnesses who testified solely about Johnson's good qualities and his potential to contribute to prison society. This would have struck the jury, in Johnson's view, as inconsistent and unreliable because only a monster could commit such a heinous crime after a strong, religious upbringing.

Johnson insists that his counsel should have investigated and presented the good and the bad. Specifically, Johnson contends the jury should have known his family history—that, among other facts, when Johnson's parents were dating, his father was arrested and later convicted of first-degree rape and first-degree robbery; his father had previously been convicted of second-degree murder; and

Johnson's mother cut all ties with Johnson's father, who was arrested yet again for other crimes but was found incompetent to stand trial, spending years in the state psychiatric hospital.

Johnson also contends that trial counsel failed to investigate Johnson's own childhood and present witnesses who could help the jury understand Johnson's difficult life. He maintains that counsel failed to investigate and develop the following negative but explanatory evidence: Johnson was well-adjusted only until around the seventh grade, when he began to commit crimes like burglary. Around the same time, Johnson and his cousin joined a gang. When Johnson's mother and step-father (whom he had always considered to be his father) divorced, Johnson was caught in the cross-fire. During this time he attended four different high schools until dropping out his junior year. After Johnson and Whitaker broke up, he ended up in a homeless shelter. When a friend visited him there (shortly before the murders), she found that "Raymond was in a bad way. He was a different person. He was just kind of lost. He had a bad cut on his arm. It became apparent that it was a suicide attempt and he was still suicidal." Aplt. Br. at 65–67. Johnson asserts here that this explanatory evidence would have allowed the jury to consider the whole Raymond before debating his sentence.

Johnson's second argument is that trial counsel did not call many of the witnesses who were prepared to testify. He alleges that in the face of motions

from the prosecutor and pressure from the trial court, counsel cut his list of witnesses more than once during the mitigation stage. Only nine witnesses testified for Johnson in the second stage as a result—down from counsel's original list of twenty-one. Trial counsel did not call, for instance, Johnson's mother, his step-father, or Jennifer Walton. This did not allow the jury, in Johnson's view, to pass judgment "equipped with the fullest information possible concerning defendant's life and characteristics." Aplt. Br. at 27.

Johnson's argument that his trial attorney failed to adequately investigate his background and childhood evaporates under scrutiny, however. Trial counsel interviewed each of the twenty-one potential witnesses, and the descriptions of these witnesses' testimony makes clear that counsel knew most (if not all) of Johnson's background and criminal history. Johnson's mother, for instance, was to speak about "the circumstances of Defendant's childhood; his relationship with his family; that Defendant never knew his biological father; the criminal history of the Defendant's family members, including his father, maternal grandfather and maternal uncles; [and] the Defendant's criminal history as known to her." R., Vol. III at 390. No fewer than six other witnesses were slated to testify on similar topics, including Johnson's childhood, teenage years, and criminal history.

Johnson is left with his contention that his trial counsel was ineffective for not calling these witnesses to testify. Yet this argument runs headlong into the

Supreme Court's decision in *Strickland*, 466 U.S. at 676–90. In that case the defendant claimed counsel had failed "to investigate and present character witnesses." *Id.* at 676. The Court set out a high bar for proving deficient performance on this type of claim because counsel's decisions are often strategic.

The Court stressed that "[j]udicial scrutiny of counsel's performance must be highly deferential," noting the temptation to conclude that counsel's "particular act or omission was unreasonable" because the assistance resulted in a conviction or an adverse sentence. *Id.* at 689. Thus, the Supreme Court counseled, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" because "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id.* Moreover, the Court set an even higher bar when defense counsel's actions could be deemed strategic. Under *Strickland* "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690.

This is the situation presented here. The trial court record shows that Johnson's counsel submitted a list of twenty-one witnesses, some of whom were to testify about Johnson's good character and some of whom were to testify about Johnson's good character *and* his difficult childhood and criminal history. Then counsel proceeded to call only those witnesses in the former category, largely

those who planned to testify about Johnson's religious work in prison and his potential to contribute to prison society.

Johnson argues that his counsel's choice was not strategic but was compelled by the prosecution's relentless determination to exclude witnesses and end the trial quickly. He points to the prosecution's repeated attempts to exclude witnesses on cumulativeness and insists his trial counsel cut the witness list only on account of the prosecutor's bullying.

But the trial court record does not support this position. Defense counsel originally planned to call twenty-one witnesses, but then the prosecution filed an objection based on the cumulative nature of much of the proposed testimony. The court held a hearing on the objection, and defense counsel told the court he planned to call only twelve of the witnesses. The court did not give any indication that it would have sustained the objection if counsel had not cut the list. Indeed, the court stated its broad view of the mitigation stage, stating, "I believe the case law is very clear that it—pretty much—it should be pretty liberal in what [evidence] is allowed. Of course, I can't have like 25 people coming up to say the exact same thing." R., Vol. Tr. IX at 1889. So trial counsel seems to have made the initial cut voluntarily and was not simply bowing to pressure from the prosecutor.

The OCCA's conclusion that trial counsel's actions were strategic is also supported by easily identifiable reasons not to call each eliminated witness. Of the eleven witnesses not called, the testimony of seven would have been largely cumulative. These seven were expected to testify about Johnson's participation in prison ministries and Johnson's abilities to sing and preach. This testimony would have mirrored the statements of many witnesses jurors heard testify.

The five other witnesses—several acquaintances, Jennifer Walton, and Johnson's mother—were reasonably excluded for another reason. These witnesses (with the exception of Walton) planned to speak about Johnson's childhood and criminal history. And Walton would have testified about her relationship with Johnson and the birth of their child after the murders. Given the double-edged nature of this testimony, counsel could reasonably have decided to forgo presenting this evidence to the jury.

As the OCCA noted, counsel's decision to call only the witnesses he did surely prevented the jury from hearing about some positive aspects of Johnson's character. But "it also precluded the jury from hearing some negative testimony about Johnson." *Johnson*, No. PCD-2009-1025, slip op. at 10. The decision not to persuade Johnson's mother to testify, for instance, "kept the jury from hearing her opinion that 'It was like Raymond has two (2) personalities. He would be the best of the best and then be the worst of the worst.'" *Id.*

-22-

In retrospect Johnson's trial counsel might have chosen a different strategy, such as to present "the whole Raymond," as Johnson now suggests. But our test under *Strickland* is much more demanding. And our review under AEDPA is much more deferential. Johnson must bear the "heavy burden" of overcoming the presumption that his trial attorney's "actions were sound trial strategy." *Fox v. Ward*, 200 F.3d 1286, 1295 (10th Cir. 2000).

This he has not done. The OCCA reasonably held that trial counsel made a strategic decision to present nine witnesses who focused predominately on Johnson's future for good in the prison system—rather than dwelling on the past and explaining why Johnson committed these murders. Again, perhaps counsel could have done both, but choosing to highlight the positive while excluding the negative was reasonable (and perhaps the best strategy given the difficult facts of this case). We therefore cannot conclude that Johnson's trial counsel's "performance was completely unreasonable, not simply wrong." *Id.* at 1295.

### 2. Ineffective Assistance of Appellate Counsel

Johnson also brings a claim of ineffective assistance of appellate counsel for failing to challenge trial counsel's performance discussed above. But because we conclude that trial counsel was not deficient for calling only the nine character witnesses, Johnson's auxiliary claim cannot succeed. Appellate counsel cannot be ineffective for omitting an unsuccessful issue on appeal, as we will only issue the

writ if there is "a reasonable probability the omitted claim would have resulted in relief" on direct appeal, *Neill*, 278 F.3d at 1057 n.5; *Moore*, 195 F.3d at 1180 (holding that our "review of counsel's decision to omit an issue on appeal is highly deferential").

### C. Prosecutorial Misconduct

Johnson next contends that his appellate counsel failed to appeal the prosecutor's misstatements at trial regarding the definition of "mitigating evidence." To succeed on this ineffective assistance claim under the Sixth Amendment, Johnson must establish both deficient performance and prejudice. *See Moore*, 195 F.3d at 1180. Again a court cannot find ineffective assistance of appellate counsel unless there is "a reasonable probability" appellate counsel's failure to raise an issue on direct appeal "would have resulted in relief," *Neill*, 278 F.3d at 1057 n.5, which in the context of a claim of prosecutorial misconduct, may occur only when a prosecutor's remarks prevented the jury from considering the defense's mitigating evidence, *see Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Breechen v. Reynolds*, 41 F.3d 1343, 1361 n.13 (10th Cir. 1994) (summarizing *Lockett* and observing that its holdings apply in "situations where the sentencer was, for a variety of reasons, prevented or precluded from considering relevant mitigating evidence").

The OCCA rejected Johnson's claim. It concluded Johnson had not shown a reasonable possibility that his sentence would have been different but for appellate counsel's failure. We interpret this analysis as concluding that these claims would not have succeeded on direct appeal, which in the context of a claim of ineffective assistance of appellate counsel means Johnson demonstrated neither deficient performance nor prejudice. We agree. The prosecutor certainly misstated the law regarding mitigating evidence at least once. But the OCCA's rejection of Johnson's claim is reasonable based on the clear jury instructions and the prosecutor's many curative comments.

The Oklahoma jury instruction defines mitigating evidence as "(1) circumstances that may extenuate or reduce the degree of moral culpability or blame, or (2) circumstances which in fairness, sympathy or mercy may lead you as jurors individually or collectively to decide against imposing the death penalty." OUJI-CR 4-78. The instruction continues that "[t]he determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case." *Id.* Johnson argues that the prosecutor repeatedly told the jury to consider only circumstances that reduced Johnson's moral culpability—prong one of the definition—thereby undermining his defense at the mitigation stage.

The prosecutor unquestionably made statements conflating the two prongs of the jury instruction. He told jurors at least four times during the mitigation stage that "[m]itigating circumstances are those which in fairness, sympathy and mercy may extenuate or reduce the degree of moral capability or blame." R., Vol. Tr. III at 386–87; IV at 698. And during two of those instances the prosecutor purported to read from the jury instruction itself. He also remarked during closing argument that "[t]he inquiry that you are to make as jurors, the Judge will tell you in the instructions, is one of moral culpability," R., Vol. Tr. X at 2092, and that "the Judge tells you the inquiry is about moral inquiry," *id.* at 2094.

Johnson also argues that the trial judge reinforced the prosecutor's misstatements by overruling defense counsel's objections. Twice during closing arguments defense counsel objected to the prosecution's purported definition of mitigating circumstances. The judge overruled both objections, noting that closing arguments are for persuasion purposes only.

Immediately following one of these objections, the prosecution made its most obvious misstatement, asserting that "[t]he instruction says this: Your consideration must be *limited* to a moral inquiry as to the culpability of the defendant. That's what the law says." *Id.* at 2095 (emphasis added). Johnson contends that this statement in particular, especially combined with the other

statements, instructed the jurors to ignore nearly all Johnson's mitigating evidence.

We are unpersuaded that the prosecutor's remarks amount to constitutional error. Granted, the prosecutor's statement regarding the "limited" nature of the jury's inquiry was a clear misstatement of the law. But as we recently held in *Grant v. Royal*, 886 F.3d 874, 937–38 (10th Cir. 2018), "[t]he test of constitutional error under *Lockett* is not (as relevant here) whether the prosecution's arguments were improper, but rather whether there is a reasonable likelihood that they had the effect of precluding the jury from considering mitigating evidence." Johnson has not shown a reasonable likelihood here—the jurors received clear jury instructions, and the prosecutor made many statements throughout the mitigation stage that cured his misstatements.

The prosecutor's comments did not mislead the jury primarily because the jury instructions clearly defined mitigating circumstances and explained the jury's responsibility. This lessens the impact of the prosecutor's statements because "improper comments of the prosecution 'are not to be judged as having the same force as an instruction from the court.'" *Grant*, 886 F.3d at 932–33 (quoting *Boyde v. California*, 494 U.S. 370, 384–85 (1990)). This is largely because statements from prosecutors "are usually billed in advance to the jury as matters of argument" whereas jury instructions "are viewed as definitive and binding statements of the law." *Boyde*, 494 U.S. at 384.

-27-

That is exactly what occurred in this case. When Johnson's counsel objected to one of the prosecutor's misstatements, the trial judge overruled the objection and told the jury, "Again, ladies and gentlemen, closing argument is for persuasion purposes only." R., Vol. Tr. X at 2094. So the jury would not have considered the prosecutor's statements as restricting their ability to consider Johnson's proffered mitigating evidence. This is why clear jury instructions, which "are viewed as definitive and binding statements of the law" can cure some improper prosecutorial misstatements. *Boyde*, 494 U.S. at 384.

And the jury instruction is a crystal clear explanation of the law. The jury would have read during deliberations that "[m]itigating circumstances are (1) circumstances that may extenuate or reduce the degree of moral culpability or blame, or (2) circumstances which in fairness, sympathy or mercy may lead you . . . to decide against imposing the death penalty." OUJI-CR 4-78. If the jury followed the instruction—which it is presumed to do—it fully considered the entirety of Johnson's mitigating defense. *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987) (courts hold an "almost invariable assumption of the law that jurors follow their instructions").

This is not to suggest that "prosecutorial misrepresentations may *never* have a decisive effect on the jury, but only that they are not to be judged as having the same force as an instruction from the court." *Boyde*, 494 U.S. at

384–85 (emphasis added).  We merely conclude that given the facts of this case, the OCCA did not unreasonably apply federal law in determining that Johnson's underlying prosecutorial misconduct claim would have failed on direct appeal. Indeed, Johnson presents a weaker underlying claim of prosecutorial misconduct than this court rejected in *Grant*, 886 F.3d at 932*,* and *Underwood v. Royal*, 894 F.3d 1154 (10th Cir. 2018).

In both cases we found curative Oklahoma's earlier jury instruction, an instruction that is far less clear than was Johnson's.  In those cases the instruction did not separate out the two relevant considerations, merely stating that "[m]itigating circumstances are those which, in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame." *Grant*, 886 F.3d at 931; *Underwood*, 894 F.3d at 1170.  And we rejected claims that the jury instruction failed to cure prosecutorial misstatements—such as "the law says . . . that before something can be mitigating it must reduce the moral culpability or blame of the defendant." *Grant*, 886 F.3d at 937.  It also bears noting that the instruction this court found curative in *Grant* and *Underwood* track almost verbatim four of the prosecutor's statements to the jury that Johnson now challenges.

Moreover, the definition of mitigating circumstances was not the only instruction the jury received on the matter.  The court gave another instruction

listing all seven of the mitigating circumstances Johnson presented. These included (1) "Raymond Johnson was an effective leader and minister during his prior incarceration" and (2) "Raymond Johnson offers a valuable contribution, through his ministry, to prison society and consequently to society as a whole." R., Vol. VI at 1077. This list of mitigating circumstances was immediately followed by the admonition that, "[i]n addition, you may decide that other mitigating circumstances exist, and if so, you should consider those circumstances as well." *Id.*; *see* OUJI-CR 4-79. The jury, consequently, could have had no doubt that it could consider each and every piece of mitigating evidence Johnson presented.

Additionally, the prosecutor made comments throughout the second stage making clear to jurors that they could (and should) consider all mitigating evidence. The prosecutor told the jury during closing argument, for instance, "You heard a lot of stuff this morning about the defendant and . . . that is entirely appropriate for you to consider." R., Vol. Tr. X at 2081. The prosecutor also walked the jury through the jury instruction, reading both prongs of the mitigating-circumstances definition and informing the jury that the question of whether there are "circumstances, which in fairness, sympathy, or mercy" caution against imposing the death penalty is "for you to decide." *Id.* at 2096.

In reviewing the totality of the second stage proceedings, Johnson has not shown a reasonable likelihood that the jury misunderstood its role and the evidence it could consider. The OCCA reasonably held, therefore, that the prosecutor's comments did not prevent the jury from considering Johnson's mitigating evidence and his appellate counsel was not ineffective in failing to challenge on direct appeal the prosecutor's statements.

## D. Cumulative Error

Finally, Johnson brings a cumulative error claim, contending that regardless of whether trial and appellate counsels' errors prejudiced his second-stage defense individually, the cumulation of errors certainly did. We have previously recognized this type of claim, noting that *Strickland* "claims should be included in the cumulative-error calculus if they have been individually denied for insufficient prejudice." *Cargle v. Mullin*, 317 F.3d 1196, 1207 (10th Cir. 2003). We therefore look to whether the state court would have reversed on cumulative-error grounds on direct appeal if Johnson's appellate counsel had brought each of the claims we "denied for insufficient prejudice." *Id.*

Johnson cannot succeed on cumulative error, however, because the only errors, assumed in our *Strickland* analysis, were the exclusion of the photographs, audio recording, and video. And even combining the prejudice resulting from these three presumed errors, we are confident that Johnson's sentence would have

-31-

remained the same. Johnson suffered no material prejudice from the exclusion of the photographs or additional audio recording, so including the harm from those assumed errors does not add much (if at all) to the prejudice determination regarding the video. Johnson cannot therefore demonstrate his "substantial rights were affected" by "aggregat[ing] all the errors that individually have been found to be harmless." *United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990) (en banc).

We accordingly affirm the district court's denial of this claim.

## III. Conclusion

We affirm the district court's denial of habeas relief to Raymond Johnson. Johnson has not shown that his state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1). Based on this analysis, we also deny Johnson's motion for an evidentiary hearing on these issues.